**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

_____

| | | |
|---|---|---|
| ALICE L. STEWART | : | |
| 460 Beverly Road | : | |
| Pittsburgh, PA 15216 | : | CIVIL ACTION |
| | : | |
| Plaintiff, | : | NO. _____ |
| | : | |
| v. | : | JURY TRIAL DEMANDED |
| | : | |
| DUQUESNE UNIVERSITY OF THE | : | |
| HOLY SPIRIT, t/d/b/a | : | |
| DUQUESNE UNIVERSITY | : | |
| SCHOOL OF LAW | : | |
| 600 Forbes Avenue | : | |
| Pittsburgh, PA  15282 | : | |
| | : | |
| Defendant. | : | |

_____:

## CIVIL ACTION COMPLAINT

Plaintiff Alice L. Stewart, by and through her undersigned counsel, hereby avers as follows:

### I.      Introduction

1.      Plaintiff has initiated this action to seek redress against Defendant, her employer, for unlawful gender discrimination, sexual harassment, and retaliation in violation of Title VII of the Civil Rights Act of 1964, as amended, and other applicable law.

### II.      Parties

2.      The allegations contained in the foregoing paragraphs of this Complaint are incorporated by reference herein as if the same were set forth at length.

3.      Plaintiff Alice Stewart (hereinafter "Plaintiff") is an adult individual currently residing at the above address.

4.     Defendant Duquesne University of the Holy Spirit (hereinafter "Defendant") is a non-profit corporation and coeducational university created and existing pursuant to the laws of the Commonwealth of Pennsylvania, with a principal place of business at the above address.

5.     At all times relevant hereto, Defendant acted by and through its agents, servants, and employees, each of whom acted within the scope of his or her job duties.

6.     Plaintiff anticipates amending the instant Complaint to add additional defendants as aiders and abettors once the investigatory time period set forth in the Pennsylvania Human Relations Act has expired.

7.     Defendant is an "employer" within the meaning of Title VII of the Civil Rights Act because it is engaged in an industry affecting interstate commerce and because it maintained or maintains fifteen (15) or more employees for each working day in each of twenty (20) or more weeks in the current or preceding calendar year.

### III.        Jurisdiction and Venue

8.     The allegations contained in the foregoing paragraphs of this Complaint are incorporated by reference herein as if the same were set forth at length.

9.     The Court may properly maintain personal jurisdiction over Defendant because Defendant's contacts with this state and this judicial district are sufficient for the exercise of jurisdiction over Defendant to comply with traditional notions of fair play and substantial justice, satisfying the standard set forth by the United States Supreme Court in *International Shoe Co. v. Washington*, 326 U.S. 310 (1945) and its progeny.

10.     The United States District Court for the Western District of Pennsylvania may exercise original subject-matter jurisdiction over the instant action pursuant to 28 U.S.C. §§ 1331 and 1343(a)(4) because it arises under the laws of the United States and seeks redress for violations of civil rights.

11.     The Court may also maintain supplemental jurisdiction over state law claims set forth herein (or later added) pursuant to 28 U.S.C. § 1367(a) and Rule 18(a) of the Federal Rules of Civil Procedure because they are sufficiently related to one or more claims within the Court's original jurisdiction that they form part of the same case or controversy.

12.     Venue is properly laid in the Western District of Pennsylvania pursuant to 28 U.S.C. §§ 1391(b)(1) and 1391(b)(2) because Defendant is located in and conducts business in this judicial district and because a substantial part of the acts and/or omissions giving rise to the claims set forth herein occurred in this judicial district.

13.     Plaintiff was employed in the Western District of Pennsylvania at the time of the unlawful actions set forth herein.

### IV.     Procedural and Administrative Remedies

14.     The allegations contained in the foregoing paragraphs of this Complaint are incorporated by reference herein as if the same were set forth at length.

15.     Plaintiff has satisfied the procedural and administrative requirements for proceeding under Title VII of the Civil Rights Act of 1964 as follows:

a.  On or about August 24, 2009, Plaintiff filed a timely written charge of discrimination (PHRC No. 200901463) with the Pennsylvania Human Relations Commission and cross-filed that charge with the Equal Employment Opportunity Commission (EEOC Charge No. 17F-2010-60823);

b.  On or about January 20, 2010, Plaintiff amended the aforesaid charge of discrimination;

c.  The Equal Employment Opportunity Commission issued a Notice of Right to Sue on the foregoing charge on or about April 28, 2010;

d.  The instant action is timely because it is initiated within ninety (90) days of the receipt of the aforementioned Notice;

    e.   Plaintiff will amend the instant Complaint to assert claims under the Pennsylvania Human Relations Act once the applicable investigation period set forth in the Act has expired.

### V.    Factual Background

16.    The allegations contained in the foregoing paragraphs of this Complaint are incorporated by reference herein as if the same were set forth at length.

17.    On December 19, 2003, the Recruitment Committee of the Law Faculty of Defendant reported the unanimous approval of three females, including Plaintiff, for clinical tenure track faculty positions.

18.    In March of 2004, Defendant's administration advised that it would deny tenure track positions to the three aforesaid females unless a national search for candidates was conducted.

19.    Instead, Defendant instituted five-year rolling faculty agreements for each of the three approved females.

20.    The five-year rolling faculty agreements resulted from discussions and negotiations between Defendant's administration and then-Dean Nicholas Cafardi.

21.    The agreements in question were intended to comply with American Bar Association accreditation standard, 405(c), for clinical faculty.

22.    On June 4, 2004, Plaintiff entered into a five-year rolling faculty agreement as a non-tenured Clinical Professor of Law with Defendant.

23.    The American Bar Association (ABA) is the accrediting agencies for Defendant's School of Law.

24.    The Defendant is a member of the American Association of Law Schools (AALS), which requires its member schools to be in compliance with the ABA standards.

25.     Defendant represented to the ABA and the AALS that the five-year rolling faculty agreements were created for its law school clinical faculty in order to provide a form of security of position reasonably similar to tenure.

26.     Since the inception of its five-year rolling faculty agreement with Plaintiff, Defendant has included Plaintiff in its student/faculty ratio, has reported Plaintiff to outside accrediting agencies as a clinical faculty member each year, and has included her in a 2007 Reaccredidation Self-Study Report and Answer.

27.     The five-year rolling faculty agreement was renewed each year for four (4) consecutive years by both Dean Nicholas Cafardi and Dean Donald Guter.

28.     In March of 2004, Defendant's administration requested that the law faculty approve a one-year visiting professor position, with the anticipation of tenure track thereafter, for a specific male without requiring a national search for candidates (as Defendant required before Plaintiff could be considered for tenure).

29.     In March of 2004, and at all times prior and subsequent to that date, the only tenured clinical professor on the faculty of Defendant was a male who earned in excess of $40,000.00 per year more than Plaintiff.

30.     The aforesaid male faculty member was hired without a national search for candidates.

31.     Plaintiff, a female professor, was and is similarly situated to her male counterpart.

32.     On or about September 11th, 2006, Plaintiff filed an internal complaint with Defendant's Compliance Officer alleging sexual harassment and hostile work environment by a male professor, one Kenneth Gormley (who later became Dean of Defendant's law school).

33.     Plaintiff was informed on January 2nd, 2007 by then-Professor Gormley that he met with University General Counsel Linda Drago to discuss Plaintiff's complaint and that his discussions with Drago were allegedly governed by attorney-client privilege.

34.     It was improper for Drago to meet with Professor Gormley to discuss a pending Complaint against him filed by another employee of Defendant because she was representing Defendant, not Professor Gormley, at the time.

35.     On May 10th, 2007 Plaintiff requested that Ms. Drago advise Professor Gormley that it was improper for an attorney-client privilege to exist between her and Professor Gormley but was not advised that this advice was given.

36.     On or about May 7th, 2007, following a five-month investigation conducted by Defendant's Compliance Officer, Plaintiff was notified that findings had been made in favor of Plaintiff with regard to her claims of sexual harassment and hostile work environment against Professor Gormley.

37.     Plaintiff was also informed of specific recommendations to the University Administration as a result of the finding that Professor Gormley had subjected her to sexual harassment and a hostile work environment.

38.     Shortly thereafter, the University obtained an opinion through outside University Counsel attempting to negate and reject the findings and recommendations of the University Compliance Officer.

39.     It is Plaintiff's understanding and belief that although no prior President of Defendant had ever rejected or failed to act on the findings and recommendations of the University Compliance Officer, University President Charles J. Dougherty has rejected or failed to act on the findings and recommendations of the University Compliance Officer on several occasions during his tenure as President – always in favor of male respondents.

40.     On May 22nd, 2007, Defendant's Provost, Ralph Pearson, advised Plaintiff by letter that, if she believed she was subjected to any retaliation for having complained of the sexual harassment, she was to advise him, as such conduct would not be tolerated.

41.     In June of 2007, Plaintiff filed a PHRC Complaint outlining the foregoing sexual harassment and hostile work environment, docketed at PHRC No. 200607723.

42.     In June of 2007, subsequent to the filing of the PHRC Complaint alleging sexual harassment and hostile work environment – and despite the findings of the aforesaid investigation - Professor Gormley was promoted by University President Dougherty to the newly- created position of Vice-President for Interdisciplinary Studies.

43.     On or about December 10th, 2008, University President Dougherty appointed Professor Gormley to the position of Interim Dean of Defendant's law school following the abrupt termination of Dean Donald Guter.

44.     Shortly following the appointment of Kenneth Gormley as Interim Dean to the School of Law he stated to a member of the law faculty that he intended to accomplish three things during his tenure as Interim Dean.  One of those items was to discredit Plaintiff.

45.     Previously, in 2004, Professor Gormley was rejected by the law faculty and the Dean Search Committee in a failed bid to become Dean of the Law School.

46.     Professor Gormley's prior position of "Vice-President for Interdisciplinary Studies" is no longer listed in the organizational chart for Defendant.

47.     In March of 2009, the law faculty was informed by Interim Dean Gormley that Defendant's internal auditors due to the "change of decanal administration" would perform a so-called "internal audit"

48.     There were no protocols or standards governing the so-called "internal audit."

49.     Rather than auditing former Dean Guter's office and budget, consistent with past practice and procedure, the internal auditors were directed to audit certain faculty members and administrative personnel.

50.     On March 18th, 2009, Plaintiff was asked to meet, and did meet, with two university internal auditors, Aaron Mitcham and Kevin Wolbert, who requested spreadsheets for Plaintiff's grant budgets.

51.     The auditors also requested program brochures, including the Vatican City Continuing Legal Education (CLE) brochure.

52.     Additionally, the auditors requested all purchase card receipts and expense reports for the current and prior years.

53.     During their meeting with Plaintiff, the auditors asked improper and irrelevant questions about Plaintiff's background and how Plaintiff came to be involved in the Vatican City CLE program.

54.     It is believed and therefore averred that Interim Dean Gormley directed the audit of Plaintiff and directed the actions of the university internal auditors in retaliation against Plaintiff.

55.     Plaintiff received her annual evaluation from Defendant's newly appointed Associate Dean, Nancy D. Perkins, on March 20th, 2009.

56.     After less than eight weeks as Associate Dean, Nancy D. Perkins asserted - without foundation - that Plaintiff was inattentive to the maintenance of her grant budgets.

57.     In her prior ten years of association with Defendant, the Dean of the School of Law had always directly evaluated Plaintiff.

58.     The evaluation of Plaintiff by Associate Dean Perkins and the baseless criticisms leveled by her against Plaintiff were made at the behest of Interim Dean Gormley in retaliation for Plaintiff's prior complaints.

59.     Prior to her March 2009 evaluation, Plaintiff had only received positive comments and evaluations during the more than ten years she had been associated with Defendant.

60.     Every evaluation conducted by Dean Nicholas Cafardi and Dean Donald Guter affirmed Plaintiffs' exemplary performance.

61.     On April 16th, 2009, Plaintiff met with university internal auditor Aaron Mitcham, the university controller, and the post-grant accountant.

62.     At that meeting, and contrary to the improper, unlawful and baseless accusations had been made by the university internal auditors that Plaintiff was misusing grant funds, all expenditures were properly accounted for and in compliance with grant terms and requirements.

63.     Plaintiff has successfully and appropriately managed Defendant's Low-Income Tax Clinic (LITC) grants since 1998 and the Pennsylvania Securities Annual Grant award since 2004.

64.     In addition, the Internal Revenue Service-Taxpayer Advocate Office and the Pennsylvania Securities Commission (which confer the foregoing grants) have repeatedly praised the work of Plaintiff.

65.     On May 7th, 2009, the university internal auditors once again contacted Plaintiff and requested additional information relative to her grants as well as information relating to the Vatican City CLE program, including but not limited to the CLE budget.

66.     The internal auditors were directed more than once by Plaintiff to speak with the director of the Vatican City summer program for budget information.

67.     On May 13th, 2009, Plaintiff filed a complaint against Defendant's internal auditors with the University Compliance Officer when she discovered that the auditors had met with a newly hired junior faculty member, allegedly for the purpose of discussing the lack of civility within the law school, but in fact to question the junior faculty member about Plaintiff's qualifications and Plaintiff's involvement in the Vatican City CLE program.

68.     The university internal auditors met with Professor Ronald Ricci on May 13th, 2009 and questioned him regarding Plaintiff's qualifications for the Vatican City CLE program.

69.     At that meeting, the auditors admitted to Professor Ricci that they had made inappropriate and offensive comments to a junior faculty member regarding the Italian ancestry of the Vatican City CLE faculty, including Plaintiff.

70.    It is submitted that the university internal auditors were the agents of Interim Dean Gormley and were retaliating against Plaintiff at his behest as a result of her prior complaints against him.

71.    Internal auditor Kevin Wolbert, in his July 29th, 2009 communication to Defendant's compliance officer, stated that "[i]n those discussions with faculty and administrative members of the School, concerns were conveyed to us regarding potential instances of self enrichment by certain individuals in the School, including Ms. Stewart" [sic].

72.    On May 14th, 2009, Plaintiff delivered to Interim Dean Gormley an internal "Principal Investigator" form outlining the Plaintiff's desire to once again apply for the federal grant, which has funded Defendant's Low-Income Tax Practicum (LITC) program since 1998.

73.    The Plaintiff was informed the following week, by the Dean's assistant, that Interim Dean Gormley would not sign the form and would not provide the required letter for matching funds.

74.    During the prior eleven years, Dean Nicholas Cafardi and Dean Donald Guter signed the required forms without reservation or hesitation.

75.    Interim Dean Gormley's action in refusing to sign the required form threatened the future funding of Plaintiff's program and was retaliatory.

76.    On or about May 25th, 2009, the Plaintiff contacted Provost Ralph Pearson, pursuant to his letter dated May 22, 2007, (*see* Paragraph 40), requesting Provost Pearson's intervention on Plaintiff's behalf with regard to Interim Dean Gormley's refusal to sign the required grant forms.

77.    Provost Pearson assured Plaintiff that he would have the required forms signed.

78.    On or about May 28th, 2009, Professor John Rago approached Interim Dean Gormley to discuss the improper behavior of the university internal auditors and their obvious attempts to discredit Plaintiff's work.

79.    During the aforesaid meeting, Interim Dean Gormley stated to Professor Rago that "Alice isn't doing herself any favors by filing these complaints."

80.    On June 26th, 2009, Interim Dean Gormley again refused to sign the internal "Principal Investigator" forms, stating that he would not sign them unless Plaintiff agreed to submit to a change in her title on the grant proposal from "Clinical Professor of Law" (the title in her contract) to the purely administrative title of "Director of the Low-Income Tax Practicum."

81.    Interim Dean Gormley willfully acted to interfere with Plaintiff's grant funding and threatened to terminate Plaintiff's grant funds.

82.    The foregoing action by Interim Dean Gormley was retaliatory and discriminatory.

83.    On or about June 15th, 2009, less than one month after Plaintiff sought the assistance of Provost Pearson to address the retaliatory conduct of Interim Dean Gormley, Plaintiff received notice from Provost Pearson that her five-year rolling faculty agreement, which had been renewed four consecutive times under two prior Deans, had been terminated and instead, Plaintiff was offered a one-year administrative contract.

84.    Provost Pearson's efforts to terminate Plaintiff's five-year rolling faculty agreement were retaliatory and discriminatory.

85.    On June 23rd, 2009, Plaintiff was informed that Professor Margaret Krasik, a full time member of the law faculty and Defendant's Interim Director of Clinical Education, had declined to be reappointed to her position as Interim Director.

86.    Despite Plaintiff's more than ten years of experience with Defendant's Clinical Programs, Interim Dean Gormley immediately appointed the Assistant Director of Clinical Education to the position of Interim Director of Clinical Education.

87.    At the time of the foregoing appointment, the Assistant Director had only worked in Defendant's clinical programs for two years and had little or no prior clinical teaching experience.

88.    By way of comparison, Plaintiff had twelve years of clinical teaching, program, and grant administrative experience at Defendant.

89.    The failure to appoint Plaintiff to the Interim Director of Clinical Education position was retaliatory and discriminatory.

90.    On June 22nd, 2009, Plaintiff filed a faculty grievance with the University Grievance Committee for Faculty alleging, *inter alia,* retaliation for the wrongful termination of Plaintiffs five-year rolling faculty agreement, improperly refused to recognize Plaintiff as a member of the law faculty, and improperly created and executed provisions for a salary reduction grant fund contingency in her contract.

91.    Subsequently, University General Counsel Drago sent a letter dated June 30th, 2009 to the University Grievance Committee for Faculty asserting incorrectly that the University Grievance Committee lacked jurisdiction to hear the Complaint.

92.    The University Grievance Committee for Faculty responded by advising General Counsel Drago that the issue of jurisdiction was a matter for the Committee to determine.

93.    Two members of the law faculty, believed to have acted at the behest of Interim Dean Gormley, approached a member of the University Grievance Committee for Faculty during the investigation of Plaintiff's grievance.  These faculty members threatened the Committee member that if he didn't find against the Plaintiff he would find himself at the wrong end of a lawsuit.

94.    The Grievance Committee has repeatedly requested Defendant's participation in the grievance process without success with respect to Plaintiff's aforesaid grievance.

95.    The refusal by Defendant's administration to participate in the internal university grievance process is retaliatory and discriminatory.

96.    On September 30th, 2009, the President of the Faculty Senate for Duquesne University sent a letter to Provost Pearson advising that "[t]he Faculty Senate Executive

Committee supports the jurisdiction of the University Grievance Committee for Faculty to hear the case of Professor Stewart."

97.     This aforesaid statement by the Faculty Senate Executive Committee was approved unanimously.

98.      Following the independent investigation by the University Grievance Committee for Faculty they unanimously concluded on May 10, 2010 that the Defendant "violated Professor Stewart's rights as a faculty member by arbitrarily changing the terms of her contract." And "that the University Grievance Committee for Faculty has standing in this matter as Professor Stewart is consistently referred to as a clinical faculty member in her contracts with the University."

99.     The Defendant has refused to acknowledge or act on the findings of the University Grievance Committee for Faculty.

100.    The refusal of Defendant to act upon the findings of the Committee is retaliatory and discriminatory.

101.    On July 9th, 2009 Plaintiff forwarded documents and a request for assistance regarding the retaliatory actions of Interim Dean Gormley to University President Dougherty and to Rev. James P. McCloskey, C.S.Sp., Vice President for Mission and Identity and a member of Defendant's Board of Directors.

102.    The above-mentioned individuals have not contacted Plaintiff nor have they assisted in stopping the retaliatory actions of Interim Dean Gormley.

103.    This failure of Defendant's administration to take action to stop the foregoing retaliation against Plaintiff is itself retaliatory and discriminatory.

104.    On July 23rd, 2009, Interim Dean Gormley called Plaintiff to a meeting under the pretext of discussing the grant budgets for her clinical programs.

105.    In attendance at the meeting were Interim Dean Gormley; Associate Dean Nancy Perkins; Business Manager Marlon Ferguson; Pre-grant Award Coordinator Marian Holden;

Associate Vice-President of Finance Dave Grousosky, and University Controller Russ Grunebach.

106.    Plaintiff requested the presence at the meeting of Professor Michael Streib (then Chairman of the Faculty Clinical Committee) and Professor Ronald Ricci (the former Law School Budget Director).

107.    Both professors were also faculty advisors to the relevant clinical programs.

108.    Plaintiff made the foregoing request in writing in anticipation of further retaliatory conduct at the July 23rd meeting.

109.    Interim Dean Gormley demanded that Professors Streib and Ricci leave the meeting room and refused to proceed until they complied.

110.    Professors Streib and Ricci stated their purpose for attending the meeting and objected to Interim Dean Gormley's demand, but agreed to leave.

111.    Interim Dean Gormley refused to permit Professors Streib and Ricci to attend the meeting because he intended to, and did in fact, publicly impugn Plaintiff at the meeting.

112.    Interim Dean Gormley asserted at the meeting that Plaintiff was an administrative employee only and not a member of the faculty, and argued that Plaintiff's salary was contingent upon and subject to adequate grant funding.

113.    At the meeting, Defendant's Associate Vice President of Finance, Dave Grousosky, agreed with Plaintiff that Plaintiff's budgets were properly funded and accounted for, and that any deficiency in the grant salary line was due to overcharges to those lines precipitated by the previous Dean's Assistant and the University's Human Resources Department.

114.    The foregoing overcharges had occurred despite Plaintiff's often-repeated requests for those charges to be rectified.

115.    Interim Dean Kenneth Gormley's efforts to impugn Plaintiff publicly were retaliatory and discriminatory.

116.    On September 10th, 2009, Plaintiff was notified by Defendant's Controller that her salary would now be contingent upon sufficient grant funding and that if grants did not provide sufficient funds, her pay would be reduced or her employment terminated.

117.    The foregoing action was retaliatory and discriminatory.

118.    On September 21st, 2009, Plaintiff was notified by Provost Pearson that she would not receive the university-wide raise of 2.5%, unlike all other non-union university employees would.

119.    Provost Pearson further notified Plaintiff that an increase in the employee share of benefit costs would be deducted from Plaintiff's salary, resulting in a net salary decrease in Plaintiff's pay.

120.    The foregoing actions were also retaliatory and discriminatory.

121.    Shortly thereafter, Plaintiff received a letter from Interim Dean Gormley dated September 14th, 2009 wherein Interim Dean Gormley advised her that not only would she not receive the university-wide raise for 2009, but that Plaintiff's salary would be reduced by $5,690.00 the following fiscal year.

122.    This action was retaliatory and discriminatory.

123.    In May of 2010 University employees were advised of a raise ranging between 2 and 3% would be given for the next fiscal year of 2010.

124.    In May, 2010 Plaintiff was notified she would again not receive the university-wide raise for the upcoming academic year, but again any increase in benefits would be deducted from her pay,

125.    This action was retaliatory and discriminatory.

126.    In or about August of 2009, at the direction of Interim Dean Gormley, Plaintiff's name was removed from the law school web page "Faculty" listing.

127.    Plaintiff's name has also been omitted from the university web page that identifies "Duquesne University Administration for the School of Law."

128.    This action was retaliatory and discriminatory.

129.    In or about August, 2009, Plaintiff's title, "Clinical Professor of Law", as designated in her contract, was removed from the general law school web page of Plaintiff's clinical programs and the purely administrative title of "Director" was added at the direction of Interim Dean Gormley and Associate Dean Nancy D. Perkins.

130.    This action was retaliatory and discriminatory.

131.    On August 26th, 2009, University General Counsel Drago, through Provost Pearson, informed the law school faculty that seven law librarians, possessing at least a Master's in Library Science (MLS), were now on the law school faculty with full faculty voting rights and the right to vote on law school decanal candidates and new faculty hires.

132.    On December 21st, 2009 Interim Dean Gormley informed Plaintiff and the law school faculty that Provost Pearson had advised him (via a memo dated December 16th, 2009) that Plaintiff would be recognized only as an administrator.

133.    As such, Plaintiff did not have full faculty voting rights and could not participate in the scheduled vote for new faculty hires or for the pending decanal candidates despite the vote of the faculty to permit Professor Stewart full faculty voting rights and the ongoing faculty grievance regarding Plaintiff's contract and faculty status.

134.    These actions by Interim Dean Gormley, with the aid of Provost Pearson, University General Counsel Drago, and Associate Dean Perkins were intended to publicly impugn Plaintiff's work and reputation and were retaliatory and discriminatory.

135.    On or about November 13th, 2009 Interim Dean Gormley demanded that Plaintiff provide him the name and phone number of her contact at the Internal Revenue Service (IRS) for

LITC grant funds. This demand was made under the pretext of "cooperating" with an upcoming audit of the LITC.

136.    Prior Deans of Defendant's law school, Nicholas Cafardi and Donald Guter, never took it upon themselves to contact grant sponsors directly.

137.     As the IRS Grant Coordinator advised Interim Dean Gormley, it is customary for the National Taxpayer Advocate Office to deal only with the program director of the sponsored LITC.

138.    The actions of Interim Dean Gormley in contacting the office responsible for providing grant funds for Plaintiff's program directly interfered with the work of Plaintiff and jeopardized future funding of Plaintiff's programs.    This action was retaliatory and discriminatory.

139.    Defendant continues to subject Plaintiff to unlawful retaliation to this day.

140.    Interim Dean Gormley has also ordered Plaintiff's office relocated outside of the Law School building and into offices amounting to less than one half of the office space she currently maintains.   This move is an effort to isolate her from faculty support and to minimize her visibility within the Law School.   This action is in retaliation for her prior complaints of sexual harassment against him.

141.    Defendant's treatment of female clinical faculty (as opposed to its treatment of their male counterparts) is not in compliance with the American Bar Association's 2009-2010 standards for Approval of Law Schools, Standard 405(c).

142.    That standard requires law schools to afford to full-time clinical faculty members a form of security of position reasonably similar to tenure, and non-compensatory perquisites reasonably similar to those provided other full-time faculty members.

143.    Defendant has offered the tenure track status path only once: to a white male.

144.    The tenure track status path has been denied to all females ever associated with Defendant's clinical programs.

145.    Since Interim Dean Gormley assumed his position, Defendant has repeatedly taken steps to strip Plaintiff of the position security and limited non-compensatory perquisites reasonably similar to those provided other full-time faculty members, that she previously enjoyed under two prior deans.

146.    Defendant is engaged in an ongoing pattern and practice of disparate treatment in tenure track status and compensation for female professionals employed in its clinical education programs.

### Count I
### Title VII – Sexual Harassment and Gender Discrimination

147.    The allegations contained in the foregoing paragraphs of this Complaint are incorporated by reference herein as if the same were set forth at length.

148.    The foregoing conduct by Defendants constitutes ongoing and continuous unlawful discrimination against Plaintiff on the basis of her gender (female).

149.    As a result of Defendant's unlawful discrimination as set forth *supra,* Plaintiff has suffered damages as set forth herein.

**WHEREFORE**, Plaintiff seeks the damages set forth in the *Ad Damnum* Clause of this Complaint, *infra*.

### Count II
### Title VII – Retaliation

150.    The allegations contained in the foregoing paragraphs of this Complaint are incorporated by reference herein as if the same were set forth at length.

151.    In complaining to Defendant about sexual harassment and gender discrimination as aforesaid, Plaintiff engaged in an activity protected under Title VII.

152.    In subjecting Plaintiff to adverse employment actions foresaid as a result of her protected activity, Defendant violated Title VII of the Civil Rights Act of 1964, as amended.

153.    As a result of Defendant's unlawful retaliation as aforesaid, Plaintiff has suffered damages as set forth herein.

**WHEREFORE**, Plaintiff seeks the damages set forth in the *Ad Damnum* Clause of this Complaint, *infra*.

### Count III
### Breach of Contract

154.    The allegations contained in the foregoing paragraphs of this Complaint are incorporated by reference herein as if the same were set forth at length.

155.    In making a valid and binding promise, supported by lawful consideration, to pay Plaintiff's salary, and in failing to do so by reducing Plaintiff's salary, Defendant committed a breach of contract.

156.    In making a valid and binding promise, supported by lawful consideration, to place Plaintiff on tenure track status, and in failing to do so, Defendant committed a breach of contract.

157.    Plaintiff provided valuable consideration to Defendant in the form of the work she performed during her employment with Defendant.

158.    As a direct and proximate result of Defendant's breach of contract, Plaintiff has incurred damages in an amount to be determined.

**WHEREFORE**, the Plaintiff seeks the damages set forth in the *Ad Damnum* Clause of this Complaint, *infra*.

### *Ad Damnum Clause/Prayer for Relief*

**WHEREFORE**, Plaintiff prays that the Court enter judgment in her favor and against Defendant and that it enter an Order as follows:

a.      Defendant is to be permanently enjoined from permitting sexual harassment, retaliation, or gender discrimination against Plaintiff;

b.      Defendant is to be prohibited from continuing to maintain its unlawful policy, practice, or custom of permitting sexual harassment, gender discrimination, and retaliation in the workplace, and is to be ordered to promulgate an effective policy against such harassment, discrimination and retaliation and to adhere thereto;

c.      Defendant is to be permanently enjoined from retaliating against Plaintiff for exercising her rights under federal and/or state law;

d.      Defendant is to be prohibited from continuing to maintain its unlawful policy, practice, or custom of retaliating against employees for engaging in protected activity under federal law, and is to be ordered to promulgate an effective policy against such retaliation and to adhere thereto;

e.      Defendant is to compensate Plaintiff, reimburse Plaintiff, and to make Plaintiff whole for any and all pay and benefits Plaintiff would have received had it not been for Defendant's unlawful actions, including but not limited to back pay, front pay, salary, pay increases, bonuses, medical and other benefits, training, promotions, pension, and seniority.

f.      Plaintiff should be accorded all benefits illegally withheld from the date she first suffered harassment, discrimination, and/or retaliation at the hands of Defendant until the date of verdict;

g.      Plaintiff is to be awarded actual damages, as well as damages for the pain, suffering, and humiliation caused to her by Defendant's actions;

h.      Plaintiff is to be awarded punitive damages as permitted by applicable law, in an amount believed by the Court or trier of fact to be appropriate to punish Defendant for its willful, deliberate, malicious, and outrageous conduct, and to deter Defendant or any other employees from engaging in such misconduct in the future;

i.       Plaintiff is to be awarded all monies due to her as a result of Defendant's breach of contract, plus interest and court costs;

j.       Plaintiff is to be accorded any and all other equitable and legal relief as the Court deems just, proper, and appropriate;

k.      Plaintiff is to be awarded the costs and expenses of this action;

l.       Plaintiff is to be awarded reasonable legal fees as provided by applicable federal and state law;

m.     Any verdict in favor of Plaintiff is to be molded by the Court to maximize the financial recovery available to Plaintiff in light of the caps on certain damages set forth in applicable federal law and to reflect the tax consequences thereof;

n.      Plaintiff is to be granted such additional injunctive or other relief as she may request during the pendency of this action in an effort to ensure Defendant does not engage – or ceases engaging – in unlawful retaliation against Plaintiff or other witnesses to this action;

o.      The Court is to maintain jurisdiction of this action after verdict to ensure compliance with its Orders therein;

p.      Plaintiff's claims against Defendant are to receive a trial by jury to the extent allowed by applicable law.  Plaintiff has also endorsed this demand on the

caption of this Complaint in accordance with Federal Rule of Civil Procedure 38(b).

Respectfully submitted,

TIMOTHY M. KOLMAN AND ASSOCIATES

By:    /s/ Timothy M. Kolman, Esquire
       Timothy M. Kolman, Esquire
       Wayne A. Ely, Esquire
       Attorneys for Plaintiff
       414 Hulmeville Avenue
       Penndel, PA  19047
       (215) 750-3134

July 27, 2010